# EXHIBIT A

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

**COMMONWEALTH OF KENTUCKY**
**PIKE COUNTY CIRCUIT COURT**
**CIVIL ACTION NO.** 18-CI-00617

HUMANA INC.
500 W. Main St.
Louisville, KY 40202,

                    Plaintiff,

          v.

CELGENE CORPORATION                                        **JURY TRIAL DEMANDED**
86 Morris Avenue
Summit, NJ 07901
Server: Kentucky Secretary of State,

                    Defendant.

---

## COMPLAINT

Plaintiff Humana Inc. ("Humana" or "Plaintiff") hereby sues Celgene Corporation

("Celgene" or "Defendant"). Based on personal knowledge as to facts pertaining to it, and upon

information and belief as to all other matters, Plaintiff alleges as follows:

### I.   NATURE OF THE CASE

1.     "The most reviled drug of the 20th century is, incredibly, on its way to a second

act. Thalidomide, used in the late 1950s and early 1960s as a sedative and anti-nausea

medication, became the ultimate symbol of pharmacopoeia gone awry. When taken by pregnant

women for morning sickness, it caused missing limb parts in the fetus . . . as well as organ

damage and death. Fifty years after the drug's heyday, the fear it inspired haunts arguments

about the safety and regulation of medications . . . That tragedy is a major reason the Food and

Drug Administration has as much authority over new drugs as it does today."[1]

2.     Enter Celgene Corporation, which has led that second act. In 1998, it obtained

U.S. Food and Drug Administration ("FDA") approval to market Thalomid® (thalidomide) for a

leprosy complication known as erythema nodosum leprosum ("ENL"). The fact that someone

was able to salvage *something* positive from the thalidomide nightmare was, in many respects,

remarkable. So far, so good.

3.     Thankfully, leprosy is rare, and ENL is rarer still. But what otherwise would be

good news for the medical community and the public at large presented a serious problem for

Celgene, which was, after all, a public company – how could Thalomid become a  commercial

blockbuster drug with such a narrow indication?

4.     Celgene successfully developed a thalidomide analog, Revlimid® (lenalidomide),

and in 2005 obtained FDA approval to market it for a specific chromosomal variant of

myelodysplastic syndromes ("MDS"), a rare blood cancer-related illness. This was, again, a

narrow clinical indication affecting a rather small patient population. In fact, Celgene would go

on to obtain FDA approvals for additional Revlimid indications for similarly narrow subsets of

blood cancer-related conditions, including for a subset of multiple myeloma ("MM") patients in

2006, and later for a subset of mantle cell lymphoma ("MCL") patients in 2013. More narrow

indications.

---

[1] Amanda Schaffer, *Thalidomide's Comeback*, SLATE (Jan. 10, 2011), *available at* http://www.slate.com/articles/double_x/doublex/2011/01/thalidomides_comeback.html.

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

5.      But Celgene did more than simply focus on the science of thalidomide after Thalomid's FDA clearance, however. In the simplest terms: Greed, coupled with impatience and a cavalier attitude towards the law, overtook science.

6.      Beginning in 1998, Celgene embarked on a systematic campaign to aggressively promote Thalomid for "off-label" uses, that is, uses for which the drug had not obtained regulatory approval and, in most instances, for which Celgene had not even sought such approval. Once Revlimid became commercially available in 2005, Celgene did the same for Revlimid.

7.      While physicians are free to prescribe drugs off-label, pursuant to their medical judgment, pharmaceutical companies are prohibited by law from promoting such uses. That did not stop Celgene.

8.      Celgene's off-label promotion of Thalomid and Revlimid became a success. By 2007 the two drugs had combined sales exceeding $1 billion and such sales have grown exponentially since, driven by Celgene's off-label promotion.[2]

9.      Celgene's off-label promotion of Thalomid and Revlimid has been enormously profitable, as demonstrated by these drugs' respective net product sales, despite their proven narrow utility[3]:

|  | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revlimid | 7000M | 5800M | 4980M | 4280M | 3770M | 3210M | 2470M | 1706M | 1325M | 774M | 321M |
| Thalomid | 152M | 185M | 221M | 245M | 302M | 339M | 387M | 437M | 505M | 447M | 433M |

---

[2] *See infra* at ¶¶ 9-10.

[3] Net product sales figures drawn from Celgene's Annual Reports/Form 10-K filings for fiscal years ending 2007-2016.

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000003 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000003 of 000039

10.    Fast forward to today: Revlimid's worldwide sales are projected to exceed $8 billion in 2017.[4]  It is now the second-highest grossing drug worldwide.[5]  Revlimid is projected to reach nearly $14 billion in worldwide sales by 2022.[6]

11.    "Unlawful off-label drug promotion has been the subject of significant health care fraud enforcement efforts by the United States Department of Justice ("DOJ"), two cities, and 28 states' attorneys general using the Federal False Claims Act ("FCA")."[7]  Indeed, Celgene recently entered into a $315 million settlement to resolve FCA claims relating to off-label promotion of Thalomid and Revlimid. Specifically, a former sales representative for Celgene (as described below) alleged that Celgene promoted these drugs to treat cancers for which they were not indicated through the FDA approval process, causing the federal Medicare program, state Medicaid programs, and other third-party payors ("TPPs") to pay hundreds of millions worth of fraudulent prescriptions for Thalomid and Revlimid.[8]

12.    Plaintiff Humana, headquartered in Louisville, Kentucky, is a leading health and well-being company focused on making it easy for people to achieve their best health with

---

[4] EVALUATE LTD., *EP Vantage 2017 Preview* (Dec. 2016), *available at* http://info.evaluategroup.com/rs/607-YGS-364/images/EPV2017Prev.pdf.

[5] *Id.*

[6] EVALUATE LTD., *Orphan Drug Report 2017* (Feb. 2017), *available at* http://info.evaluategroup.com/rs/607-YGS-364/images/EPOD17.pdf.  Not surprisingly, Revlimid was the top-selling "orphan drug" in the United States in 2016. *Id.* "An orphan drug is a pharmaceutical product aimed at rare diseases or disorders." *Id.*

[7] CENTERS FOR MEDICARE & MEDICAID SERVICES, *Off-Label Pharmaceutical Marketing: How to Recognize and Report It* (Oct. 2015), *available at* https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/off-label-marketing-factsheet.pdf.

[8] U.S. DEPARTMENT OF JUSTICE, *Celgene Agrees to Pay $280 Million to Resolve Fraud Allegations Related to Promotion of Cancer Drugs for Uses Not Approved by FDA* (July 24, 2017), *available at* https://www.justice.gov/usao-cdca/pr/Celgene-agrees-pay-280-million-resolve-fraud-allegations-related-promotion-cancer-drugs.

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000004 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000004 of 000039

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

clinical excellence through coordinated care. Humana offers its members (also referred to herein as "beneficiaries") a variety of health insurance products and services, including under Medicare Parts C and D, as well as commercial, Medicaid and TRICARE options.

      13.    During the time periods addressed above, Humana spent many millions on off-label Thalomid and Revlimid, much of which was ineffective, or worse, endangered the patients. Humana seeks civil damages it has incurred resulting from Celgene's years-long practice of surreptitiously marketing Thalomid and Revlimid for uses for which they were neither approved by the FDA nor medically efficacious.

      14.    Celgene's unlawful scheme to market Thalomid and Revlimid for off-label uses for which it is ineffective and unacceptably dangerous, carried out through an enterprise comprised of Celgene, marketers, prescribing physicians and providers of continuing medical education programs ("CME"), was and continues to be in violation of a variety of state laws, including the laws of the Commonwealth of Kentucky, as set forth below.

## II.    <u>JURISDICTION AND VENUE</u>

      15.    This Court has personal jurisdiction over Celgene because Celgene carried on a continuous and systematic part of its general business within the Commonwealth of Kentucky, and purposefully caused harm and tortious injury in this Commonwealth. This Court may exercise personal jurisdiction over Celgene consistent with due process, KRS 454.210, KRS 23A.010(1), and the Fourteenth Amendment to the Constitution of the United States. Moreover, Celgene has transacted the business that is the subject matter of this lawsuit in this Commonwealth.

      16.    Humana suffered injury in this Commonwealth because Celgene, through its misconduct, caused Humana to pay money for off-label prescriptions of Thalomid and Revlimid

in this Commonwealth and for Humana's Kentucky members, as more particularly alleged

below.

17.     Humana's injuries arose from these unlawful activities, because they were the

means through which Celgene caused Humana to pay for ineffective and/or dangerous off-label

Thalomid and Revlimid prescriptions.

18.     Venue is proper here under KRS 452.450, KRS 452.460, KRS 452.480, and KRS

454.210(4), because Celgene violated numerous laws of the Commonwealth of Kentucky and

other jurisdictions, causing injury to Humana in Pike County as described in this Complaint.

Humana paid for actionable Thalomid and Revlimid claims for one or more members residing

here in Pike County in amounts that substantially exceed the jurisdictional threshold of this

Court, as set forth in KRS 23A.010(1) and 24A.120(1).

## III.     **THE PARTIES**

19.     Humana Inc. is a Delaware corporation headquartered at 500 West Main Street,

Louisville, Kentucky. Humana is publicly-traded under the NYSE symbol "HUM."

20.     Humana is the parent company, and assignee of the claims, of subsidiaries and

affiliates that provide, *inter alia*: (1) Medicare benefits through contracts with the Centers for

Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of

Medicare Advantage plans offered under Part C of Medicare, or prescription drug benefits under

Part D of Medicare; and (2) private commercial health insurance plan benefits that cover the

medical expenses incurred by plan beneficiaries on an individual or group basis. Humana's

subsidiaries provide these benefits to beneficiaries in all 50 states, the District of Columbia, and

Puerto Rico, and Humana is the second largest Medicare Advantage Organization in the United

States. These assignor subsidiaries and/or affiliates include: Arcadian Health Plan, Inc., CarePlus

Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc.,
CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management,
Inc., dba ChoiceCare Network, Humana AdvantageCare Plan, Inc., Humana Behavioral Health,
Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc.,
Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc.,
Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc.,
Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of
Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance
Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto
Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc.,
Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health
Organization Insurance Corporation and M.D. Care, Inc. Humana's subsidiaries and affiliates
expressly have assigned the claims pleaded herein to Humana.

   21. Humana is also the parent and assignee of claims of its subsidiary Humana
Pharmacy, Inc. f/k/a Rightsource ("HPI"). HPI buys prescription drugs directly from
manufacturers and wholesalers and dispenses them to Humana's benefits plan members on a
mail-order and retail pharmacy basis, pursuant to their doctors' prescriptions. HPI has purchased
Thalomid and Revlimid directly from Celgene at commercial prices in effect at the time of HPI's
orders, pursuant to a 2010 contract (subsequently amended) between Celgene and HPI.

   22. Humana is also the parent and assignee of claims of its subsidiary Humana
Pharmacy Solutions, Inc. ("HPS"). HPS is a pharmacy benefit manager ("PBM") that provides
Humana's benefits plan members with benefits and services, including processing and pricing
prescription drug claims and managing Humana's prescription drug formularies.

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

23.     Defendant Celgene Corporation is a drug manufacturer and a Delaware corporation headquartered at 86 Morris Avenue, Summit, New Jersey. It is publicly-traded under the NASDAQ symbol "CELG." Celgene manufactures and markets Thalomid and Revlimid.

## IV.     REGULATORY BACKGROUND

24.     The FDA regulates the marketing and promotion of prescription drugs. Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392) ("FDCA"), and its implementing regulations, before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a), 360b(a).

25.     Furthermore, pursuant to the FDCA, 21 U.S.C. § 301, *et seq.*, the FDA strictly regulates the content of product promotion and drug labeling information used by drug companies to market and sell FDA-approved prescription drugs.

26.     The FDA interprets "labeling" in its regulations broadly to include items that are 1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel. 21 C.F.R. § 202.1. The FDCA defines both misleading statements and the omission of material facts in product labeling as "misbranding." 21 U.S.C. § 321(n). Labeling includes brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material. 21 C.F.R. § 202.1 (l)(2). The FDA regulations deem "advertising" to include any media-based activities that appear in magazines, newspapers, published journals and on television, radio, and telephone communications systems. 21 C.F.R. § 202.1(l)(1). Oral statements made by a company's sales representative relating to a pharmaceutical product have also been deemed to constitute advertising or promotion.

Filed          18-CI-00617     05/16/2018        Anna Pinson Spears, Pike Circuit Clerk

27.     Among other requirements, all information provided by drug companies about its products must present a "fair balance" between positive and negative information about a drug. 21 C.F.R. § 202.1(e)(5)(ii).

28.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371; 21 C.F.R. §§ 202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.

29.     Misbranding also exists where, among other things, promotional and marketing materials and presentations for an FDA-approved drug "[c]ontain[] a representation or suggestion, not approved or permitted for use in the labeling, that a drug is better, more effective, useful in a broader range or conditions or patients … than has been demonstrated by substantial evidence or substantial clinical experience …." 21 C.F.R. § 202.1(e)(6)(ii).

30.     Furthermore, a drug must have labeling that provides adequate information for its safe and effective use by practitioners for all the purposes for which it is intended, including all purposes for which it is advertised or represented. 21 C.F.R. §§ 201.100(c)(1), 201.100(d), 201.56, 201.57, and 201.80. Thus, an approved drug that is intended by the drug company for an unapproved use would be misbranded, because the drug does not satisfy the requirement that its labeling bear adequate directions for use.

31.     As a result, drug companies may only promote their products for uses approved by the FDA. 21 C.F.R. §§ 201.100(c)(1), 201.100(d), 201.56, 201.57, and 201.80.

32.     Drug companies may only be involved in the provision of information about off-label uses in limited circumstances. One such circumstance is where a drug company provides funding to an accredited independent sponsor of continuing medical education programs,

Filed          18-CI-00617     05/16/2018              Anna Pinson Spears, Pike Circuit Clerk

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000009 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000009 of 000039

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

provided the content of the programs is truly independent and the drug company does not influence this content. FDA, *Guidance for Industry, Industry-Supported Scientific and Educational Activities* (December 1997).

33.    Another circumstance is where a physician makes a bona fide, unsolicited request to the drug company for information about an off-label use. FDA, *Draft Guidance for Industry, Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (December 2011).

34.    In those limited circumstances where a drug company can provide information about an off-label use, such information is required to present a fair balance and not be false or misleading.

35.    These guidelines regarding off-label uses create a structure whereby a drug company can effectively but illegally encourage off-label uses of a drug by acting through purportedly-independent medical education program providers and physicians that are in fact under the effective control of the drug company. This is exactly the conduct Celgene engaged in here with respect to Thalomid and Revlimid.

## V.    CELGENE'S RACKETEERING SCHEME AND OTHER MISCONDUCT

36.    In 1998, Celgene secured from the FDA a single indication for Thalomid, to treat a skin disease, erythema nodosum leprosum ("ENL"), associated with leprosy. This condition is exceedingly rare and affects only a few hundred people per year in the United States.

37.    Instead of marking Thalomid for this relatively rare condition, Celgene embarked on a scheme to market Thalomid for various types of cancer based on minimal or non-existent evidence.

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000010 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000010 of 000039

38.     This scheme was highly successful and profitable. In its 1999 Annual Report, Celgene admitted that more than 90% of Thalomid prescriptions were for cancer, a purpose not approved by the FDA. Bob Hugin, the then-CFO of Celgene Corp., stated at the Lehman Brothers Global Health Care Conference on or about Mar. 31, 2005 that about 92% of Thalomid prescriptions were for cancer. Mr. Hugin boasted that Thalomid was the "financial engine" powering Celgene's growth, delivering the company's first full-year positive earnings in 2003. Indeed, Celgene never would have been in the financial position to leverage Thalomid into the even more profitable analogue Revlimid had Celgene not illegally promoted Thalomid in such a widespread and systematic way.

39.     In late 2005, Celgene secured an FDA indication for lenalidomide and named the branded product Revlimid. The FDA approved a single, limited indication for Revlimid for a relatively uncommon subtype of the blood disorder, myelodysplastic syndrome ("MDS") (transfusion-dependent anemia due to low or intermediate risk MDS when associated with a deletion 5q cytogenic abnormality with or without additional cytogenic abnormalities), an early stage of cancer.

40.     In June 2006, Celgene secured another indication for Revlimid, allowing it to market the drug for a second narrow indication for multiple myeloma ("MM") taken in combination with dexamethasone, for patients who had received at least one prior therapy.

41.     In February 2014, Celgene secured a third indication for Revlimid, allowing it to market the drug for treatment of newly-diagnosed MM.

42.     In February 2017, Celgene secured a fourth indication for Revlimid, allowing it to market the drug for treatment of MM following autologous stem cell transplant.

43.     Revlimid is extremely expensive. Prescriptions can cost as much as $120,000 per year, per patient. Revlimid was ten times more costly than the already-expensive Thalomid. Indeed, in mid-2017, Celgene increased the price of Revlimid to $608 per pill. As one analyst observed, however, Revlimid "is a small molecule and cheap to produce, but more than 100 times more expensive than gold."[9]

44.     Accordingly, Celgene began an aggressive campaign to switch Thalomid patients to Revlimid (thus continuing the effects of its previous illegal off-label marketing of Thalomid).

45.     At the same time, as with Thalomid, Celgene proceeded to market Revlimid for a variety of cancers for which it had not been approved by the FDA. Celgene aggressively marketed Revlimid for at least nine off-label uses: brain cancer, leukemia, lymphoma, myelofibrosis, myelodysplastic syndromes (all types), new onset multiple myeloma (prior to the FDA's approval), multiple myeloma not in combination with the drug dexamethasone (prior to the FDA's approval), prostate cancer, and stem-cell transplant maintenance therapy (prior to the FDA's approval).

46.     And as with Thalomid, this scheme was enormously profitable for Celgene. Revlimid sales in 2008 and 2009 totaled more than $1.7 billion, and have continued to increase with more than a billion dollars in sales every year since then.

A.      **CELGENE'S OFF-LABEL MARKETING SCHEME**

1.      **The Thalomid Scheme**

47.     As detailed in a *qui tam* complaint filed in the United States District Court for the District of California, *U.S. ex rel. Brown v. Celgene Corp.*, No. 2:10-cv-03165, Celgene engaged

---

[9] "Celgene and Revlimid: Potential Targets for Trump?" (Jan. 17, 2017), *available at* https://seekingalpha.com/article/4037309-celgene-revlimid-potential-targets-trump.

Filed          18-CI-00617   05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

in a years-long scheme – acting with outside entities such as continuing education providers and physicians – to fraudulently and in violation of FDA regulations induce off-label prescriptions for Thalomid and Revlimid.

48.     In denying Celgene's motion for summary judgment on the FCA claims, the District Court relied on the parties' agreement that the off-label indications did not have the requisite support in the CMS-designated compendia, necessary for Medicare and private plan coverage and payment. *United States v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1043 (C.D. Cal. 2016). Celgene settled these claims in July 2017 by paying $315 million to the United States, the City of Chicago, the District of Columbia and 28 states.

49.     This scheme was first successfully executed for Thalomid and carried over to Revlimid, both because Celgene sought to switch prescriptions from Thalomid to Revlimid and because Celgene used the same methods for both drugs.

50.     The Relator in *Brown* was hired at Celgene in April 2001 as a sales representative, but given the misleading title of "Immunology Specialist" to suggest she was a medical professional rather than a sales person.

51.     Celgene also gave the Relator the title "S.T.E.P.S. Field Coordinator" – a reference to Thalomid's FDA-mandated education, recordkeeping, and distribution system intended to mitigate the inherent risks of Thalomid – and dispatched her to medical practices under the guise of assisting physicians with the S.T.E.P.S. (now known as REMS) program. This program was used as an additional opportunity to off-label market Thalomid for off-label uses to physicians who thought they were receiving assistance in complying with S.T.E.P.S.

Filed          18-CI-00617   05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000013 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000013 of 000039

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

52. In or around December 2004, the Relator's title was changed to Hematology Oncology Consultant, reflecting Celgene's intensifying efforts to market Thalomid for cancer treatment.

53. Under all these titles, the Relator was directed by Celgene to market Thalomid and Revlimid to physicians for off-label uses.

54. When the Relator joined Celgene in April 2001, Thalomid was only approved for treatment of ENL. It did not receive an additional indication until a full five years later, in May 2006. Nevertheless, Celgene never provided the Relator any information or training concerning Thalomid's use to treat ENL.

55. Celgene also failed to train the Relator about FDA rules and regulations prohibiting off-label marketing.

56. Instead, the Relator was trained to explicitly market Thalomid for off-label uses. Soon after being hired, the Relator was required to accompany another Celgene sales representative for a day for additional training. During this training, the Relator witnessed this representative converse with a doctor regarding a patient suffering from renal cell cancer. The doctor asked the representative about the proper Thalomid dose to treat renal cell cancer. The representative told him "400 [mg] is what works" even though there is no evidence to support this dosage and there is no FDA approval for renal cell cancer. The Relator accompanied this same representative on additional visits and watched her promote Thalomid to treat other solid tumor cancers, including cervical cancer.

57. Furthermore, according to the Relator, Celgene sales representatives were rewarded by Celgene based on the volume of their sales, which necessarily included off-label sales. Celgene's compensation and bonus structure incentivizes its sales force to meet or exceed

A480E083-4D2A-40C0-89CD-A5EA78716E6E : 000014 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000014 of 000039

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

certain benchmarks in drug sales. On March 23, 2003, Celgene distributed an internal memorandum to the Relator and other Celgene sales representatives from Celgene's then-National Executive Director of Sales, stating that the Relator and her colleagues would have "the opportunity to earn additional bonus money with each additional sales level achieved," at a time when Thalomid was approved only for a single, rare indication related to leprosy.

58.     When Celgene faced heightened scrutiny relating to its bonus structure, it pretended to curb its illegal practices but, in reality, continued them. At the 2005 National Sales Meeting, Celgene's Senior Vice President of Sales and Marketing informed Celgene's sales force that they would no longer be compensated for Thalomid sales. In 2005 Celgene anticipated FDA approval of Revlimid and, according to this Vice President, the Company was worried that the FDA would question Thalomid's high volume of sales because Thalomid was then only approved for ENL. This Vice President said that Celgene intended to tell the FDA that Celgene's sales force was paid for administering the S.T.E.P.S. distribution system, not for Thalomid sales. This would indicate to the FDA that Celgene's sales force was not paid or incentivized to market Thalomid off-label. This Vice President also told Celgene sales personnel that not providing bonuses for off-label sales would show the FDA that sales representatives were not directed to off-label market. This Vice President said this would "protect" the sales representatives and Celgene would be able to show the FDA that the Company was not "out of line." Despite these statements, however, Celgene did provide bonuses based on Thalomid sales in 2005.

59.     This conduct was part of a plan directed at the highest levels of management to market Thalomid for off-label uses.

60.     In 2004, at a Celgene National Sales Meeting at the Lacosta Resort and Spa in Carlsbad, California, Celgene provided its sales force with a written off-label marketing plan for

Thalomid. At that meeting, the West Region Sales Director was present and provided the

Celgene sales force with the "2004 Business Plan West Region (the 'Plan')." The Plan focused

"solely on Thalomid," and instructed sales personnel to, *inter alia*, "[e]mphasize MM, MDS and

targeted solid tumor activity[1] on every [sales] call." This was despite the facts that: (1) Thalomid

has never been approved for the treatment of solid tumor-cancers (as opposed to some

hematological cancers), and (2) Thalomid did not receive FDA approval for MM until May 2006

and, even then, for a very narrow indication.

61.    The Plan provided a "Market Analysis Summary" that reported that Celgene's

West Region through 2003 caused physicians to prescribe Thalomid to 230 brain cancer patients,

400 melanoma patients, 1000 MM patients, 730 MDS patients, 45 ovarian cancer patients, 250

prostate cancer patients, and 420 renal cell (i.e., kidney) cancer patients. This Plan also set

"specific additional new patient goals, by malignancy."

62.    The Plan also encouraged Celgene sales representatives to use numerous studies,

journal articles and abstracts identified in the document when marketing Thalomid for off-label

uses.

63.    The Relator and other Celgene sales representatives successfully implemented the

Plan. Celgene continuously monitored sales of Thalomid through, among other things,

distributing spreadsheets on a periodic basis to the Relator and her colleagues that included a tab

labeled "Indication Breakdown" and provided the "Total Business" for Thalomid in specific

diseases. According to Celgene's spreadsheet for the first quarter of 2004, from the first quarter

of 2003 through the first quarter of 2004, Celgene's West Region sales force successfully caused

physicians to prescribe 131,702 Thalomid capsules for MM patients, 13,608 for MDS patients,

Filed            18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

and 1,484 for prostate cancer patients, and a total of 190,342 capsules for all patients combined. This same spreadsheet indicates that zero physicians in the region prescribed Thalomid for ENL.

64.     Celgene also routinely sent its sales force to its headquarters in Summit, New Jersey to participate in off-label training sessions. For example, the West Region Sales Director conducted a "Phase II Training" in 2014 to assist Celgene's sales force in marketing Thalomid for off-label uses. Celgene required its entire sales force to attend this training. The Phase II Training materials discussed Thalomid use for the following cancers: prostate, ovarian, melanoma, renal, colorectal, brain, pancreatic, bladder, esophageal, gastric, testicular, cervical, uterine, breast, and thyroid. Following the Phase II training session, this Sale Director circulated a number of off-label studies concerning these diseases to sales representatives for use in dealings with physicians. Celgene routinely conducted mandatory training seminars similar to this Phase II Training at its headquarters in Summit, New Jersey.

### 2.     Extension of the Thalomid Scheme to Revlimid

65.     Celgene's conduct with respect to Thalomid provided the "playbook" by which it would later reap illegal profits from inducing off-label prescriptions for the even more-profitable Revlimid.

66.     Celgene, its management, and sales personnel engaged in similar conduct with respect to Revlimid.

67.     Upon Revlimid's launch and continuing through at least 2011, Celgene provided the Relator with "Revlimid Standard Letters" and a compilation of studies concerning off-label uses for Revlimid. These compilations included studies concerning Revlimid's use for the off-label treatment of cancers, including off-label combinations and or uses.

Filed            18-CI-00617    05/16/2018          17   Anna Pinson Spears, Pike Circuit Clerk

68.     Celgene provided the Relator and her sales colleagues with a "Launch 2006 Reprint Cheat Sheet," that summarized various abstracts and studies to be used in promoting Thalomid and Revlimid. These studies and abstracts failed, however, to provide legitimate scientific support for the proposed off-label uses.

69.     For example, Celgene gave its sales representatives an article by Dr. Vincent Rajkumar, which was published in the December 2005 issue of *Blood*. Celgene directed sales representatives to use the article to "detail" physicians about the use of Revlimid for newly diagnosed MM. Dr. Rajmakur had received grant support from Celgene. The study purported to compare lenalidomide and dexamethasone to thalidomide and dexamethasone. Dr. Rajkumar suggested that the prior drug combination was more effective and less toxic than the latter in treating MM. The article, however, provided no information about the thalidomide group, such as the number of patients, trial period or treatment regimen. Without that information, physicians could not draw reliable conclusions about how lenalidomide compares to thalidomide. Nonetheless, the Relator, at Celgene's direction, provided copies of this study to virtually every doctor she called upon.

70.     Celgene also gave its sales representatives copies of what it represented was an article by Michael Wang and other authors, appearing in the December 2008 issue of *Blood*, for use in persuading physicians that Revlimid could be used in patients previously treated with Thalomid. Yet what appeared to be an article by independent authors was actually a Celgene-commissioned pharmaceutical advertisement. Nine of the twelve authors (including four Celgene employees) received financial support from Celgene. The studies discussed in the article were likewise funded by Celgene. Rather than presenting a new study, the Wang advertisement merely analyzed a subset of data obtained from two prior studies conducted by Celgene. The authors

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

looked at only selected data and results from those prior studies and concluded (from preliminary

data in early phase 1 and phase 2 trials) that Revlimid alone and in combination with

dexamethasone produced a response in patients who had previously received thalidomide. The

subgroups analyzed by Wang, however, numbered as few as ten or fifteen patients – numbers

that are too small to provide meaningful results. Indeed, the advertisement noted that the analysis

"is a post hoc analysis, performed without pre-specified power calculation or adjustment for

multiplicity, and is therefore considered exploratory in nature." Moreover, the data also

demonstrated that a patient who was first treated with thalidomide was not likely to do as well on

Revlimid as a patient previously treated with another drug. At Celgene's direction, the Relator

and her colleagues provided copies of this study to doctors.

     71.    The Relator and other Celgene sales representatives were also trained and

instructed to "probe" physicians to induce discussions of off-label Thalomid and Revlimid uses.

For example, an April 27, 2010 email from a Celgene district sales manager provides questions

sales representatives should ask doctors about Cutaneous T cell lymphoma ("CTCL"), a class of

non-Hodgkin's lymphoma, which is a type of cancer of the immune system. In his email, this

manager attached "CTCL target lists, CTCL profiling tool[s], and the Cross Functional meeting

slides" and said the "critical questions" to ask doctors were:  How many patients with CTCL are

you currently treating? How many new patients with CTCL do you see per year? Are these

patients referred by a dermatologist? The FDA has never approved Revlimid to treat Cutaneous

T cell lymphoma.

     72.    Celgene required the Relator and other sales representatives to disguise the nature

of these probing interactions by pressuring them to persuade physicians to execute "medical

information request forms" for off-label uses of Thalomid and Revlimid. A physician's

unsolicited and voluntary request directly to a drug company for information generally is not considered evidence of company's intent to misbrand or off-label market a drug, and medical information request forms are intended to memorialize such a request. Celgene subverted the purpose of such forms by requiring its sales representatives to verbally discuss off-label uses of its drugs during visits with physicians and then to ask physicians to request materials from Celgene using these forms, making it appear that a physician's request for off-label information from Celgene's medical services department was voluntary and unsolicited, rather than initiated and pressured by the sales representative.

73.     Celgene carefully tracked the number of medical information request forms executed by each of the sales representatives. Those who had failed to obtain a sufficient number of such forms were admonished, while those who had obtained a large number were praised, sometimes in very public ways (such as at national sales meetings).

74.     Again, these off-label marketing efforts were dictated from the highest level of Celgene. For example, in his 2006 evaluation, Celgene management directed the Vice President of Marketing "to develop and execute [Revlimid] [marketing] plans for Non 5q-MDS, CLL [chronic lymphocytic leukemia] and NHL [non-hodgkin lymphoma]." The FDA has not approved Revlimid to treat any of these conditions.

### 3.   Use of Outside CME Providers and Physicians to Execute the Scheme

75.     The use of continuing medical education ("CME") programs led by speakers paid by Celgene to tout the benefits of using Thalomid and Revlimid for non-indicated diseases was critical to Celgene's scheme. As set forth above, FDA regulations prohibit Celgene from directly advertising Thalomid and Revlimid for off-label uses. Celgene engaged in such direct advertising despite this prohibition, but also attempted to conceal its conduct by acting through

A48DE083-4D2A-40C0-89CD-A5EA787I6E6E : 000020 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000020 of 000039

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

entities and individuals not directly affiliated with Celgene by a corporate or employment relationship.

76.     Celgene provided educational grants for various CME programs concerning Thalomid treatment in MM, MDS, and renal cell carcinoma, among other diseases (at the time, Thalomid was only approved to treat ENL). These CMEs consisted of speakers paid by Celgene to promote Thalomid's off-label uses. In or about 2003 or 2004, Dr. Howard A. Burris, III, for example, gave Celgene-sponsored speeches concerning "Recent Developments and Future Directions in the Treatment of Renal Cell Carcinoma." At the time, he was both a paid Celgene consultant and a member of Celgene's Speakers Bureau (described below).

77.     Celgene selected speakers for such CME events based on the number of Thalomid (and later Revlimid) prescriptions that they wrote or based upon a belief that the speaker would write more prescriptions once he/she was paid by Celgene to present a CME.

78.     Celgene understood CME programs were an effective way to promote its products for off-label uses, and therefore extended the use of CMEs to Revlimid. For example, one sales representative wrote a May 26, 2006 email stating that "[o]bviously, if Revlimid gets approval [to treat MM], you will not be able to discuss the role of Revlimid in Newly Dx'd patients, so having a CME accredited resource that discuss all options for Newly Dx'd [diagnosed] patients will be very valuable." Four days later, on May 30, 2006, this email was forwarded to managers, praising this message as a "super initiative" and "a good way to be sure the field is aware of the wide array of educational offerings."

79.     Celgene controlled the content of these CMEs. For example, in late 2006 or early 2007, a sales representative in the West Region used Dr. Mark Kirschbaum to present a CME at Hoag Hospital in Orange County. The sales representative confronted him after he failed to

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

A480E083-4D2A-40C0-89CD-A5EA78716E6E : 000021 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000021 of 000039

mention in a CME the use of Revlimid to treat non-5q deletion MDS patients (Revlimid is only approved by the FDA to treat low- or intermediate risk MDS that is associated with a deletion 5q abnormality).

80.     Celgene also used outside physicians to further the scheme by designating certain physicians who are known to write a high volume of Revlimid prescriptions as "Thought Leaders." After Celgene designates a physician as a Thought Leader, the Thought Leader is connected with a company called Envision which trains the Thought Leaders to give presentations and facilitates Thought Leader programs ("Envision Programs"). These programs are not formal CME events but can be, for example, a one-on-one, in-office conversation between a Thought Leader and another physician or a meal presentation either within or outside of a physician's practice. Physicians are paid from $1,600 to $4,000 for each Envision Program he or she conducts. As part of Celgene's Envision speaker training, Celgene and Envision developed written material, including PowerPoint presentations and slides, for use by physicians at speaker's programs. Celgene encouraged its sales force to provide the materials to speakers who lectured on the off-label uses of Revlimid.

81.     From 2006 through 2009, the Relator was required to facilitate 15 or 16 Envision Programs per year and was asked to target physicians who were known to write a high number of prescriptions for competing drugs. For example, an August 31, 2009 email from the Relator's district sales manager to her and other sales representatives stated that sales representatives should focus on "opportunities in high Velcade or Dacogen accounts."

82.     Celgene also promoted a "Speakers Corps" series, whereby Celgene handsomely paid physicians to speak on topics selected by Celgene such as "Recent Developments and Future Directions in the Treatment of Multiple Myeloma" or "The Role of Revlimid

(lenalidomide) in Multiple Myeloma." Some of these speakers were engaged multiple times by Celgene and/or spoke multiple times in a single day.

83.     Celgene analyzed its "investment" in speakers both formally and informally. A 2009 PowerPoint on its "Speakers Bureau" includes slides describing it "Return on Investment Analysis" and its efforts to "quantify any additional revenue of speaker bureau programs." Celgene's also evaluated its sales force, in part, based upon the increase in prescriptions written by paid speakers.

### 4.     Celgene's Manipulation of the RevAssist Program

84.     Due to the high risk of birth defects with Thalomid and Revlimid, the FDA requires Celgene to implement strict distribution systems for each drug. Revlimid prescribers must comply with the REMS system (as described above) that includes what Celgene refers to as the RevAssist system. Thalomid prescribers must comply with a similar system. The Agreement described below implements and reflects the operation of this RevAssist system.

85.     The physician uses RevAssist software (loaded onto a computer via CD and accessible online) to create a Patient-Physician Agreement Form ("PPAF"). The PPAF has a patient information page, where the physician selects the patient's "Diagnosis" from a "drop-down" menu of ICD-9 codes, which are three-to-five digit codes indicating the disease for which a patient is receiving Revlimid. The physician then completes either an online or telephone survey confirming that the patient has been counseled about the risk of birth defects, and the need to use protection if engaging in sexual intercourse while taking Revlimid. After completing the survey, the physician receives an authorization number from Celgene that allows him or her to write the prescription. A physician must complete this survey every time he or she writes a prescription.

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000023 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000023 of 000039

86.     Once the physician writes a prescription, RevAssist requires the physician to complete a dedicated RevAssist prescription form. This form can be generated through RevAssist software, faxed to the physician from Celgene, or downloaded from Celgene's website. The form has a blank field for the "Patient's Diagnosis Code (ICD-9 Code)."

87.     The physician is then required to submit the prescription to a "specialty pharmacy" (such as one operated by Humana's subsidiary HPI) that is specifically licensed to supply Revlimid. When the specialty pharmacy receives the prescription form, the pharmacist must contact Celgene and confirm the physician's authorization code.

88.     In or about 2006, shortly after Revlimid's launch, the Relator's manager directed the Relator and other sales representatives to "change the [ICD 9] codes" on Revlimid prescriptions generated through RevAssist that were written for off-label indications to reflect that the prescriptions were for on-label uses. At the 2009 national sales meeting in Scottsdale, Arizona, during a "district break-out session," the manager of the West Region's so-called "Patient Support Program" directed the West Region sales representatives to change the codes on physicians' Revlimid prescriptions.

89.     The Relator objected to this practice and, thus, received an unjustified poor performance review for the first time in her career.

### 5.     Switching Patients from Thalomid to Revlimid

90.     As set forth above, Celgene engaged in a scheme to induce off-label prescriptions for Revlimid. Using similar tactics, it also induced physicians to switch Thalomid prescriptions to Revlimid prescriptions because the latter is substantially more expensive than the former, even though there is no valid evidence that one is more effective than the other.

91.     Celgene trained the Relator and other sales representatives to move physicians from Thalomid to Revlimid. The Relator participated in a "Phase III" training at Celgene's corporate headquarters in New Jersey from June 26 through June 29, 2007. During this training, she and the other sales representatives were required to "[i]dentify 10 prescribers that have written Thalomid MM but not Revlimid MM," and then list "tactics you will employ with these prescribers" and "probing questions you might ask." The Relator and other sales representatives were also instructed to make unsubstantiated claims about the purported superiority of Revlimid to Thalomid with respect to efficacy and side effects.

92.     A February 11, 2008 email from Celgene's Vice President of Sales referred to the need to "crack" physicians who have prescribed Thalomid but not Revlimid. In this email, this Vice President circulated a list of physicians who have prescribed Thalomid but not Revlimid, and wrote "Let's get a plan together on what we need to convert these docs . . . I am sure there are nuances for some that we will not crack but other should be ready for 'cracking.'"

93.     Celgene rewarded sales representatives and sales teams who successfully converted the most patients from Thalomid to Revlimid through what it called "Rev/Dex" contests. A November 7, 2008 email from this Vice President to Celgene's sales force and sales and marketing departments stated, "Looks like Atlantic Central is leading the way in quarterly standings with an average of 6.10 patients converting from Thalomid MM to Revlimid MM . . . Keep up the great work with our customers!" And at its April 13-14, 2010 West Region Cross Functional Meeting, Celgene presented data for each representative's conversion. Representatives who were most successful in converting physicians from Thalomid to Revlimid earned points that could be exchanged for gifts, including airline tickets, vacations, clothing, appliances, and jewelry.

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

### 6.   Celgene's Use of its Own and Third-Party Charities to Encourage Off-Label Use

94.     Under the guise of giving away free drugs, Celgene provided free Thalomid and Revlimid to uninsured patients suffering from conditions for which these drugs were not approved. Once the patients became insured (either through a government program or through private insurance), they continued to use Thalomid and Revlimid but with the TPP rather than Celgene paying for the prescriptions.

95.     Celgene also donated hundreds of millions of dollars to patient assistance charities that help patients pay the co-payment for expensive drugs, such as Thalomid and Revlimid, and coordinated with these charities to ensure that these drugs would be covered. This allowed Celgene to collect the rest of the drugs' price from TPPs such as Humana.

96.     Celgene disclosed in 2016 that it had received a subpoena from the U.S. Attorney's Office for the District of Massachusetts that sought documents relating to Celgene's financial support to patient-assistance charities. This is part of a recent broader Department of Justice investigation targeting misuse of donations to such charities by large drug companies such as Celgene.

97.     In the *Brown* action, it was revealed that contracts between Celgene and two patient-assistance charities, the Chronic Disease Fund and the Patient Access Network Foundation, required these charities to provide a substantial amount of information to Celgene to allow Celgene to in essence match its donations to specific requests for assistance with co-payments for Revlimid. Information produced in that case also showed Celgene exercised an unusual amount of influence over the operations and decisions of these charities as they related to Celgene's drugs.

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000026 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000026 of 000039

Filed          18-CI-00617    05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

98.     The Office of the Inspector General of the U.S. Department of Health and Human Services has recently condemned such arrangements, where purported patient-assistance charities provide such information and allow such influence by their drug-company donors, because such arrangements allow the charities to "serve[] as a conduit for financial assistance from a pharmaceutical donor to a patient, and thus increase the risk that the patients who sought assistance from Requestor would be steered to federally reimbursable drugs that the manufacturer donor sold."[10]

### 7.    Fraudulent Concealment, Tolling, and Celgene's Continuing Violations with Respect to Off-Label Marketing

99.     To avoid sanction and regulation by the FDA, Celgene's scheme as alleged above depended on Celgene's affirmative concealment of its extensive involvement in the off-label promotion of Thalomid and Revlimid. Indeed, Celgene used CME programs, its Thought Leaders Program, and its Speakers' Bureau program to control the marketing of Thalomid and Revlimid under the guise of medical education activities. In addition, Celgene used other methods, such as inducing physicians to complete sham medical information request forms, to conceal its conduct.

100.    Furthermore, the misconduct alleged in this Complaint is of a continuing nature and has continuing harm to Humana. Every prescription for an off-label use of Thalomid and Revlimid for which Humana paid and continues to pay is part of a continuing course of conduct.

---

[10] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL, Determination to redacted recipient re Advisory Opinion No. 06-04 (Nov. 28, 2017), *available at* https://oig.hhs.gov.fraud/docs/advisoryopinions/2017/AdvOpnRescission06-04.pdf.

### 8.   Causation and Injury to Humana from the Off-Label Marketing Scheme

101.    The scheme alleged above was intended to, and did, cause Humana and other TPPs to pay for Thalomid and Revlimid prescriptions to treat conditions for which they have not been approved by the FDA and/or for which they have not been proven effective. In the absence of Celgene's conduct, Humana would not have paid for such prescriptions.

102.    Among other things, Humana's Pharmacy Coverage Policy for Oncology allows for preauthorization of off-label use of oncology drugs, such as Thalomid and Revlimid, in limited circumstances, such as where the use of such drugs are medically-accepted for certain indications as evidenced by undisputed articles from certain peer-reviewed medical journals, such as *Blood*. As alleged above, Celgene's off-label marketing scheme included placement of misleading articles controlled and/or funded by Celgene in medical journals.

103.    Furthermore, as alleged above, Celgene manipulated the RevAssist system to cause physicians to provide inaccurate diagnosis codes to Humana and other TPPs in connection with prescriptions for Revlimid.

104.    TPPs such as Humana are the intended victims of Celgene's off-label marketing scheme, as Celgene understood well that such TPPs would bear the majority of the costs for unnecessary prescriptions for Thalomid and Revlimid.

105.    Humana has sampled its Thalomid and Revlimid claims data and associated documentation, and identified many instances in which it paid for claims for these drugs associated with clinical indications that were neither: (a) approved by the FDA, nor (b) supported by the CMS-identified compendia (as admitted by Celgene in the *Brown* litigation).

**B.** **THE CONTRACT BETWEEN HUMANA PHARMACY (RIGHTSOURCE) AND CELGENE**

106.    HPI is a party to a Pharmacy Distribution and Services Agreement dated July 1, 2013 ("Agreement") with Celgene, whereby HPI buys Revlimid directly from Celgene. Previous versions of this same Agreement relating to Revlimid have been in effect since at least August 2010.

107.    From 2010 through 2017, Humana has paid many millions of dollars for Revlimid. A significant part of this amount was for uses for which Revlimid has not been approved by the FDA and/or for which it has not been proven effective.

**VII.    CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Fraud**

108.    Humana incorporates by reference the preceding allegations.

109.    The Agreement between Celgene and HPI provides, in relevant part, that Celgene is required to ensure that the products subject to the Agreement, including Revlimid, "compl[y] … with all applicable laws, regulations, directives and requirements of the FDA, including without limitation, packaging and labeling requirements, product warning requirements, product design and safety requirements and advertising requirements." Agreement, ¶ 11.1. All previous versions of the Agreement contained the same or substantially similar language.

110.    In addition, the 2011 and 2010 version of the Agreement contain the following provision immediately after the one quoted above: "Celgene represents and warrants that it shall comply with all other applicable federal, state and local laws, regulations and ordinances related to its business." 2010 and 2011 Agreements, ¶ 11.1.

AA80E083-4D2A-40C0-89CD-A5EA787l6E6E : 000029 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000029 of 000039

111.    At the time Celgene entered this Agreement and its predecessors, it had a long history of marketing Revlimid (and other drugs such as Thalomid) for off-label purposes. Its business plan for Revlimid in fact assumed that much of the revenue generated by Revlimid sales would be from off-label uses.

112.    Thus, from the inception of the Agreement, Celgene was not complying and never intended to comply with FDA laws, regulations, directives, and requirements with respect to labeling and advertising Revlimid. It nonetheless entered into the various versions of the Agreement, and thus made knowing misrepresentations to Humana.

113.    This misrepresentation is and was material, as no TPP would enter into such an agreement if that TPP was aware that a drug company intended to violate FDA laws, regulations, directives, and requirements with respect to labeling, advertising and distribution of a drug.

114.    Accordingly, Celgene intended for TPPs to rely on its representation that it would comply with FDA laws, regulations, directives, and requirements with respect to labeling, advertising, and distribution of Revlimid.

115.    Humana was induced to and reasonably relied on Celgene's representation that it would comply with all FDA laws, regulations, directives, and requirements with respect to labeling, advertising, and distribution of Revlimid.

116.    Celgene's misrepresentation caused injury to Humana, in that Humana has made millions of dollars in payments for Revlimid that it would not have made had Celgene not made this misrepresentation.

### SECOND CLAIM FOR RELIEF

### Breach of the Agreement

117.    Humana incorporates by reference the preceding allegations.

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

118.   The Agreement between Celgene and HPI provides, in relevant part, that Celgene is required to ensure that the products subject to the Agreement, including Revlimid, "compl[y] … with all applicable laws, regulations, directives and requirements of the FDA, including without limitation, packaging and labeling requirements, product warning requirements, product design and safety requirements and advertising requirements." Agreement, ¶ 11.1. All previous versions of the Agreement contained the same or substantially similar language.

119.   In addition, the 2011 and 2010 version of the Agreement contain the following provision immediately after the one quoted above: "Celgene represents and warrants that it shall comply with all other applicable federal, state and local laws, regulations and ordinances related to its business." 2010 and 2011 Agreements, ¶ 11.1.

120.   Humana is an intended beneficiary of the Agreement and its predecessors, as well as an express assignee of HPI's rights under the Agreement.

121.   As set forth above, Celgene engaged in extensive violations of laws, regulations, directives and requirements of the FDA with respect to the labeling and advertising of Revlimid by marketing Revlimid for off-label uses.

122.   This breach has directly and proximately injured Humana, in that Humana has made millions of dollars in payments for Revlimid that it would not have made had Celgene not breached the Agreement.

123.   These damages were foreseeable at the time of contracting because among the purposes of Celgene's agreement to comply with FDA laws, regulations, directives and requirements was to avoid the needless expenditure of funds on off-label uses for a drug, and Humana's desire to ensure that parties with whom it was contracting were complying with all

AA80E083-4D2A-40C0-89CD-A5EA78716E6E : 000031 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000031 of 000039

applicable laws and regulations related to the manufacture, labeling, advertising and distribution of drugs.

### THIRD CLAIM FOR RELIEF

### Negligent Misrepresentation / Restatement (Second) of Torts § 552

124.    Humana incorporates by reference the preceding allegations.

125.    Celgene, in the course of its business and/or in the course of transactions in which it has a pecuniary interest, has supplied false, misleading, and inaccurate information for the guidance of others in their business transactions relating to Thalomid and Revlimid as alleged above, including but not limited to, TPPs such as Humana. Celgene has supplied such information through the Agreement and through other means, such as causing misleading information about the efficacy of Thalomid and Revlimid for off-label indications to be widely disseminated through various channels.

126.    Celgene, at a minimum, failed to exercise reasonable care or competence in communicating information about the efficacy of Thalomid and Revlimid for off-label uses.

127.    Celgene intended to supply this information for the benefit and guidance of TPPs such as Humana and intended for this information to influence TPPs such as Humana in transactions involving Thalomid and Revlimid.

128.    Humana suffered pecuniary loss in justifiable reliance on such information, in that Humana has made millions of dollars in payments for Thalomid and Revlimid because it justifiably relied on the accuracy of this information in the Agreement and communicated via various other channels.

A48DE083-4D2A-40C0-89CD-A5EA78716E6E : 000032 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000032 of 000039

### FOURTH CLAIM FOR RELIEF

#### Unjust Enrichment

129.   Humana incorporates by reference the preceding allegations.

130.   By paying for millions of dollars' worth of prescriptions for Thalomid and Revlimid that it would not have paid but for Celgene's misconduct as alleged above, Celgene received substantial benefits, at Humana's expense.

131.   Celgene recognized and appreciated these benefits.

132.   Based on the facts and circumstances alleged above, it would be grossly inequitable for Celgene to retain these benefits, and therefore the value of these benefits should be restored to Humana.

### FIFTH CLAIM FOR RELIEF

#### Violation of New Jersey RICO (N.J.S.A. § 2C:41-2(c)

133.   Humana incorporates by reference the preceding allegations.

134.   Celgene is a "person" within the meaning of the New Jersey's Racketeer Influenced and Corrupt Organizations Act ("NJ RICO"), N.J.S.A. § 2C:41-1(b), who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of N.J.S.A. § 2C:41-2(c).

135.   The enterprise here is an association-in-fact within the meaning of N.J.S.A. § 2C:41-1(c) consisting of Celgene, the providers of the continuing medical education programs described above, and the physicians who participated in such programs and Celgene's Thought Leaders and Speakers' Bureau programs as described above. This enterprise is an ongoing organization that functions as a continuing unit, and was created and/or used as a tool to effectuate a pattern of racketeering activity. Celgene is a "person" distinct from this enterprise.

Filed        18-CI-00617   05/16/2018        Anna Pinson Spears, Pike Circuit Clerk

This enterprise has a single purpose, the off-label marketing of Thalomid and later Revlimid, defined relationships among the participants, and longevity sufficient to permit the participants to pursue this purpose.

136.    Celgene established the enterprise to create a parallel marketing structure that appeared independent from its sales personnel to circumvent FDA regulations concerning off-label marketing of Thalomid and Revlimid.

137.    This enterprise engaged in and affected trade or commerce in the State of New Jersey and elsewhere (including this Commonwealth), because it caused Thalomid and Revlimid to be marketed from Celgene's headquarters in New Jersey to thousands of physicians and individuals throughout the United States, including this Commonwealth, and caused TPPs such as Humana to pay millions of dollars for off-label prescriptions of Thalomid and Revlimid.

138.    Celgene knowingly exercised control over this enterprise, and knowingly participated in the operation and management of this enterprise by, among other things, controlling the information and content provided by the continuing medical education programs and speakers, providing the funding for such programs and speakers, and causing its employees to direct and coordinate the activities of such programs and speakers.

139.    Celgene conducted and participated in the affairs of this enterprise through a pattern of racketeering activity that includes "conduct defined as 'racketeering activity' under Title 18, U.S.C. § 1961(1)(A), (B) and (D)," N.J.S.A. § 2C:41-1(a)(2), including acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

140.    These acts were to further Celgene's unlawful scheme, which consisted of deliberately misrepresenting the uses for which Thalomid and Revlimid has been proven to be

Filed        18-CI-00617   05/16/2018        34   Anna Pinson Spears, Pike Circuit Clerk

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

effective; providing or causing to be provided written materials to physicians containing false and misleading information on which physicians were intended to rely; and actively concealing information about Celgene's off-label marketing activities as set forth above.

141.    This enterprise used the mails and wire to implement the scheme. The planning and coordination of continuing medical education programs and speakers' programs involved numerous written and oral communications transmitted by mail and/or wire, a few examples of which are cited above. The Agreement between Celgene and Humana as described above, and documents relating to the Agreement, were also transmitted through the mails and wire.

142.    Celgene acted with the requisite *scienter* with respect to these acts. At all times, Celgene acted with the specific intent to defraud. In the alternative, Celgene acted recklessly by creating conditions and incentives that it knew, or should have known, would cause its officers, employees, and/or agents to engage in the fraudulent scheme described above.

143.    The conduct of this enterprise constitutes "racketeering activity" within the meaning of N.J.S.A. § 2C:41-1(a)(2), and Celgene's use of the enterprise to conduct its marketing activities over the course of several years constitutes a "pattern of racketeering activity" within the meaning of N.J.S.A. § 2C:41-1(d). Each such instance of racketeering activity was related, had the same purpose, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, such as Humana and other TPPs. Furthermore, Celgene's racketeering activities are part of its ongoing business and constituted, and continue to constitute a continuing threat of criminal activity.

144.    Humana has been injured in its business and property by reason of these violations, in that Humana has made millions of dollars in payments for Thalomid and Revlimid that it would not have made had Celgene not engaged in this pattern of racketeering activity.

Filed          18-CI-00617  ·  05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

Filed          18-CI-00617     05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

145.   Humana's injuries were directly and proximately caused by Celgene's racketeering activity.

146.   By reason of this violation of N.J.S.A. § 2C:41-2(c), Celgene is liable to Humana for three times the damages Humana has sustained, plus the costs of suit including reasonable attorneys' fees pursuant to N.J.S.A. § 2C:41-4(c).

### SIXTH CLAIM FOR RELIEF

#### Conspiracy to Violate NJ RICO (N.J.S.A. § 2C:41-2(d)

147.   Humana incorporates by reference the preceding allegations.

148.   Section 2C:41-2(d) of NJ RICO provides that it "shall be unlawful for any person to conspire as defined by N.J.S.A. 2C:5-2, to violate any of the provisions of this section."

149.   Celgene has violated Section 2C:41-2(d) by conspiring to violate Section 2C:41-2(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise described above through a pattern of racketeering activity.

150.   As alleged above, Celgene and its co-conspirators agreed to and have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Humana and other TPPs.

151.   The nature of these overt racketeering acts demonstrates that Celgene and its co-conspirators have agreed to the objective of a Section 2C:41-2(d) violation of NJ RICO by conspiring to violate Section 2C:41-2(c), and that they were aware of their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

152. Humana has been injured in its business and property by reason of conspiracy, in that Humana has made millions of dollars in payments for Thalomid and Revlimid that it would not have made had Celgene not entered into this conspiracy.

153. Humana's injuries were directly and proximately caused by this conspiracy.

154. By reason of this violation of N.J.S.A. § 2C:41-2(d), Celgene is liable to Humana for three times the damages Humana has sustained, plus the costs of suit including reasonable attorneys' fees pursuant to N.J.S.A. § 2C:41-4(c).

## VIII.   DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Celgene, as follows:

1. Awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2. Ordering Celgene to restore to Humana the benefits Celgene unlawfully retained at Humana's expense;

3. Permanently enjoining Celgene pursuant to N.J.S.A. § 2C:41-4(a) from continuing its unlawful conduct;

4. Declaring the acts alleged herein to be unlawful under the statutes set forth above;

5. Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

6. Awarding all other legal or equitable relief as the Court deems just and proper.

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000037 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000037 of 000039

Filed        18-CI-00617    05/16/2018        Anna Pinson Spears, Pike Circuit Clerk

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated:  May 16, 2018                    Respectfully submitted:

**BAIRD & BAIRD, P.C.**
*s/ Russell H. Davis, Jr.*
Russell H. Davis, Jr.
162 Second Street
P.O. Box 351
Pikeville, KY 41502
(606) 437-6276
rdavis@bairdandbaird.com

**KAPLAN, JOHNSON, ABATE & BIRD LLP**

Michael P. Abate
James M. McGhee
710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
mabate@kplouisville.com
jmcghee@kplouisville.com

**LOWEY DANNENBERG, P.C.**

Richard W. Cohen (*Pro hac vice* to be filed)
Peter D. St. Phillip (*Pro hac vice* to be filed)
Uriel Rabinovitz (*Pro hac vice* to be filed)
Noelle Ruggiero (*Pro hac vice* to be filed)
Jennifer Risener (*Pro hac vice* to be filed)
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
RCohen@lowey.com
PStPhillip@lowey.com
URabinovitz@lowey.com
NRuggiero@lowey.com
JRisener@lowey.com

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000038 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000038 of 000039

Filed          18-CI-00617   05/16/2018          Anna Pinson Spears, Pike Circuit Clerk

**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**

Todd M. Schneider (*Pro hac vice* to be filed)
Jason H. Kim (*Pro hac vice* to be filed)
Kyle G. Bates (*Pro hac vice* to be filed)
2000 Powell Street
Suite 1400
Emeryville, CA 94608
(415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
KBates@schneiderwallace.com

Garrett W. Wotkyns (*Pro hac vice* to be filed)
8501 North Scottsdale Road
Suite 270
Scottsdale, AZ 85253
(480) 428-0144
GWotkyns@schneiderwallace.com

**HUMANA INC.**

Matthew R. Varzally
Senior Counsel—Litigation & Investigations
500 West Main Street
Louisville, KY 40202
(502) 476-4116

*Counsel for Humana Inc.*

A4B0E083-4D2A-40C0-89CD-A5EA78716E6E : 000039 of 000039

Presiding Judge: HON. EDDY COLEMAN (635126)

COM : 000039 of 000039